# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# AT LOUISVILLE

ALABAMA FARMERS
COOPERATIVE, INC.                                                                   PLAINTIFF

v.                                                                                    NO.3:07-CV-543-JDM

DENNIS JORDAN                                                               DEFENDANT

## MEMORANDUM OPINION

      This matter is before the court on cross-motions for summary judgment. The plaintiff, Alabama Farmers Cooperative, Inc. ("AFC"), seeks a declaration that under the parties' two lease agreements, AFC holds a tenancy under an option to renew the lease through July 2010, as well as a purchase option, and that greenhouses on the leasehold are trade fixtures and thus personal property of AFC. AFC further moves for summary judgment on the counterclaim of the defendant, Dennis Jordan. In turn, Jordan moves for partial summary judgment that AFC is a hold-over tenant under Kentucky statute. For reasons stated below, the court concludes AFC is entitled to summary judgment on Jordan's counterclaim but that the greenhouses are not trade fixtures and Jordan's construction of the lease agreement prevails.

## I.

      AFC is a lessee of fifteen acres (the subject of one lease) and mobile homes (the subject of the second lease), known as Upton Station, used in a greenhouse-based plant growing operation, in Hardin County, Kentucky. Jordan is both the land owner and, initially, an AFC employee, a station manager. The tenancy is the result of an arrangement between the parties whereby Jordan purchased the land needed for Upton Station and leased it back to AFC in exchange for a yearly rental payment. Jordan purchased the 15 acres for $28,500. and leased it

back to AFC for five years starting on August 1, 1995. The lease called for AFC to pay $4,400 in annual rent and contained an option to purchase at the original land price and an option to renew the lease for additional five years at the same annual rent.

During this lease term, AFC placed six greenhouses at Upton Station and paid for all materials and assembly labor. Over the next eight years, AFC placed an additional 28 greenhouses, for total of 34, which are still located there today. AFC contends these greenhouses are simple, easily movable structures. The main supports are hollow metal bows, placed and bolted into metal sleeves that have been driven 18 inches into the ground and secured in concrete in most cases. Six-millimeter-thick plastic is stretched over the bows to create the greenhouse. AFC maintains that although they are simple structures, the greenhouses are not cheap; 24 of the greenhouses are valued at more than $200,000. AFC insured the greenhouses and paid property taxes. The greenhouses are included in the property tax assessments.

Jordan purchased four mobile homes for use as office space and temporary housing for workers. AFC leased the mobile homes beginning in August 1995 as well.

The 1995 leases were set to expire on July 31, 2000, according to AFC.[1] "That expiration passed without any written renewal of the leases. Nevertheless, AFC (through its agent, Dennis Jordan) remained in possession of Upton Station after July 31, 2000. ... In fact, AFC stayed on Upton Station through the entire 2001 growing season, during which time Jordan – in both the tenant's and landlord's shoes – never once asked AFC to pay rent."

In December, 2000, AFC sent Jordan a new lease agreement for the period August 1, 2000 to July 31, 2005, with the same terms as the 1995 leases, except that the option to renew

---

[1] Mem. in Support of AFC's Mot. for Summ. J. (dkt 57) at 12.

was revised to an additional five years through July 31, 2010.  Jordan refused to sign, contacted a lawyer and demanded that the option to purchase be raised to $40,000, and that the leases were contingent on the solvency of AFC, and that the trailer leases double the annual rent to $6,700.  At that time, AFC paid the first year's rent under the terms of the 2001 lease.

According to AFC, it occupied the leasehold with no problem over these years, because its primary agent, Jordan, was also its landlord.  "The July 31, 2005 expiration date on the 2001 Lease then came and went with absolutely no change.  AFC, through Jordan, continued to occupy the real estate and trailers for the next two years with Jordan's consent and approval."[2]

In December 2006, Jordan gave AFC notice of his resignation, effective July 31, 2007.[3]  In January, 2007, AFC asked Jordan to sign a new lease.  At the time, the lease had been expired for over a year and a half and AFC owed back rent for two and a half years.[4]  Dennis Thomas, of AFC stated, "I wanted another lease," and stated he would not pay back rent until Jordan signed the lease.[5]  In January 2007, Jordan notified AFC that their tenancy would end on July 31, 2007.[6]

On or about June, 21, 2007, Jordan demanded rent and property taxes for "the season," $11,000 plus $4,337.[7]

AFC paid the entire property tax bills for Upton Station for 2005 and 2006 – both of which came due after July 31, 2005.  Jordan accepted rent from AFC for the two-year period

---

[2]Id. at 14.

[3]Dennis Jordan affidavit ¶ 11 (dkt 61).

[4]Mem. in Opposition ... and in Support of Cross-Motion (dkt 58) at 11.

[5]Id.

[6]Jordan aff. ¶ 12.

[7]See supra n.4, ex. "L."

-3-

after the expiration of the 2001 lease. Jordan refused to allow AFC personnel onto Upton Station. He claimed ownership of the greenhouses and refused to permit AFC to disassemble them.

AFC filed suit for declaratory and monetary relief for breach of contract and related claims. Jordan counterclaimed for additional compensation.

**II.**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Rule 56 further provides that "[w]hen a motion for summary judgment is made and supported [by affidavit] ..., an adverse party may not rest upon the mere allegations ..., but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e).

At the summary judgment stage of litigation the pivotal issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986).

**III.**

The court must first determine the nature of AFC's tenancy after July 31, 2005, the date the original lease term expired.[8] AFC seeks declaratory relief that it holds a five-year tenancy and purchase option, by operation of the 2005 lease's renewal provision, under the same terms and conditions set forth in the original lease. Jordan maintains that the original lease expired and that, thereafter, AFC became a hold-over tenant, by operation of Ky. Rev. Stat. Ann. §383.160(1). In summary, the court concludes AFC failed to exercise the plain and unambiguous renewal option in accordance with its terms and that the hold-over statute, therefore, applies.

The 2001 land lease is a simple one-page document, including signatures, and entered on December 3, 2001.[9] It states in relevant part:

> That the Lessors ... demise and lease to ... Lessee ... for the period of 5 years commencing the 1st day of August, 2000, and ending the 31st day of July, 2005 [the described premises.]
>
> Lessee has the option to buy out Lessor for the purchase price of $40,000.00 at any time. In interest accrued from August until that time will be paid by Bonnie.
>
> The annual rent during said term shall be $4,400. Lessee agrees to pay in one payment by the 15th day of Aug. of each year.
>
> The Lessee shall have the option to renew this lease at the end of five (5) years for another (5) years at the same annual rent.

---

[8]As a preliminary matter, "a general covenant for renewal ordinarily will be construed as providing for only one renewal." *Farris v. Laurel Explosives, Inc*., 474 S.W.2d 487, 489 (Ky. App. 1990).

[9]For ease of discussion, the court will address the land lease provisions, although the land and trailer leases are at issue, with each containing substantially identical language. The 2001 leases are attached as exhibits J and K to AFC's memorandum in support of summary judgment.

AFC chiefly relies on *Lexington Flying Service v. Anderson's Ex'r*, 239 S.W.2d 945, 946-948 (Ky. 1951), which states that when a renewal provision does not require the lessee to perform a positive act, such as notice, before its terms might be extended, then "the holding over, with payment and acceptance of rent, is enough to vitalize the lease for the extended period." AFC further cites *Klein v. Auto Parcel Delivery Co.*, 234 S.W.213 (Ky. App. 1921), for the proposition that no new, renewal lease is necessary and that the hold-over statute does not apply because the tenant's continued possession of the premises, with the payment and acceptance of rent, triggered the renewal provision for an additional five-year period. AFC argues that, like the leases in these two Kentucky cases, the renewal provision in the 2001 lease had no requirement that AFC announce an intent to renew prior to expiration of the original term and that two events, the continued possession after July 31, 2005 and the payment and acceptance of rent, triggered the renewal provision. The court respectfully disagrees.

In both *Klein* and *Lexington Flying Service,* the court recognized a distinction between an option to renew and an option to extend:

> [T]he word "renew" connotes that a new, formal agreement in writing should be executed by the parties in order to conform to the definition of the word or, at least, some positive act other than a mere holding over beyond the fixed term must be taken, while the requirements of the definition of the word "extend" are satisfied by a holding over, accompanied by the payment and acceptance of rent, with the result that the force of the terms of the lease to continue in effect for the extended term.

*Lexington Flying Service*, 239 S.W.2d at 946, discussing *Klein*, 234 S.W. at 215.

In both cases, the pivotal inquiry was the intention of the parties. The duty of the court is "simply to arrive at and effectuate the original intention of the parties as evidenced in their document." *Klein,* at 215. In *Klein*, the original lease provided a rent payment that was

-6-

increased during the renewal period. The payment and acceptance of the higher rent amount clearly displayed a tenancy under the renewal provision. The court concluded that "the conduct of the parties before the controversy arose" demonstrated that in the contract language, they intended the word "renew" to be synonymous with the word "extend." *Id.,* at 215-16.

Likewise, in *Lexington Flying Service* the court reiterated the rule applied in *Klein* as it considered whether the holding over for three successive years, with the payment and acceptance of rent, "extended" the terms of the original lease. 239 S.W.2d at 946-47. The tenant sued for specific performance of a purchase option in a one-year lease, which stated, "Said lease to extend for a period of one year, with the privilege to said second party to lease from year to year upon the same terms and conditions as contained in this lease." *Id.,* at 945. The lease itself was titled, "Extension of Lease, dated December 18, 1942." *Id.,* at 946. Notably, it incorporated by reference, and attached as Exhibit B, an option to purchase at $300 per acre, as stated in a lease document, dated eight years' previous, in May, 1934. *Id.* The court relied on *Klein* and stated:

> [T]he word "renew" will not be given its strict legal interpretation, unless it is evident from some provision of the lease, or from the conduct of the parties that the word was not used as a synonym for the word "extend" ... . Each case depends on the particular facts presented by the conditions set forth in each lease and the conduct of the parties to the lease.

*Id.,* at 947; *see also Weber v. C & C Dry Goods Co.*, 59 S.W.2d 731 (Ky. App. 1934) (finding the parties intended to extend but expressed it in terms of renewal). The court concluded the parties intended the word "renew" to mean "extend." "The lease under consideration did not require that Lessee to perform some positive or special act before its terms might be extended." *Id.,* at 948. The context of the lease, itself , was telling. The 1942 lease adopted by reference a purchase option with a price term of 1934, and there was no suggestion that three years later, the

-7-

parties intended to renew the lease in a new document – the incorporated terms sufficed. Accordingly, the court enforced the purchase option and held that the holding over, with the payment and acceptance of rent, was sufficient to vitalize the lease for the extended period. *Id.*

Jordan contends the lease did not automatically renew by virtue of the AFC's continued possession and payment of rent but that the renewal provision required the parties to enter a new lease. *See Electronic Sales Engineers, Inc. v. Urban Renewal and Comm. Dev. Agency*, 477 S.W.2d 814 (Ky. App. 1972) (holding that a valid exercise of an option to renew required execution and delivery new lease documents). The Court agrees. The particular facts and conduct of the parties to the lease and the plain language itself supports that the parties intended a renewal lease rather than an extended lease.

Unlike the tenants in *Klein* and *Lexington Flying Service*, AFC's holding over was not an outward manifestation of its intent to renew the lease. AFC failed to make rental payments by August 15th in 2005 and 2006, during what would have the renewal period, as expressly provided in the lease. In turn, AFC criticizes Jordan for failing to request timely payment, as was his responsibility as station manager, and for ejecting AFC from Upton Station in violation of his duty of loyalty as a fiduciary of his employer, AFC. The argument fails to reconcile, however, that Jordan, as the lessor and landowner, was both principal and agent, and any conflict of interest arose with AFC's full knowledge and consent, as their "arrangement" permitted AFC to protect its limited capital investment budget and enter Hardin County on Jordan's personal investment in the purchase of Upton Station.[10]

Another important distinction is that Jordan's acceptance of back rent was not an outward

---

[10]Mem. in Support of AFC's Mot. for Summ. J. at 4.

manifestation of his intent to renew, as in *Klein* and *Lexington Flying Service*. Jordan demanded payment of back rent well after he announced his resignation, in December 2006, and after he provided six months' notice to end the tenancy July 31, 2007. In January 2007, AFC's general manager asked Jordan to sign a new lease. Both parties manifested an understanding that lease renewal was not automatic, conduct that arose before the event which AFC argues triggered the renewal provision. These intervening circumstances distinguish this case from the two reported cases on which AFC relies and contradict AFC's construction of the renewal provision.

The renewal provision in the AFC lease plainly states that AFC shall have "the option to renew this lease at the end of five (5) years... ." When a writing states the contract between the parties, it must govern absent fraud or mistake in its preparation. *Sanders v. Wender*, 265 S.W. 939 (Ky. App. 1924). In the exercise of contract interpretation, the surrounding circumstances or the situation of the parties may enlighten the court. *Farris v. Laurel*, 797 S.W.2d 487 (Ky. App. 1990); *Lexington Flying Service*, 239 S.W.2d at 947 (stating each case has been decided by the application of the rule [liberal interpretation of the terms renew and extend] to the particular facts presented by the conditions set forth in each lease and the conduct of the parties to the lease).

Jordan argues the history of the parties' dealings supports his interpretation of the lease, that is, Jordan emphasizes that the 2001 lease, itself, is a renewal lease between the parties. The court agrees. Parole testimony may enlighten the court upon any situation of the parties, although preliminary negotiations cannot vary the writing itself. *Sanders v. Wender*, 265 S.W.939 (Ky. App. 1924); *see also* RICHARD A. LORD, WILLISTON ON CONTRACTS § 32:7 (4th ed.) (stating that evidence of other objectively determinable factors which give a context to the

-9-

transaction between the parties is admissible notwithstanding the parol evidence rule). The parties first entered into leases in 1995, which contained identical renewal language. The result was the negotiation of a new lease, with an increased purchase price and rental. The new lease addressed AFC's solvency. The uncontroverted evidence establishes that the parties' conduct before the 2001 lease and following the its expiration in 2007 displayed an intent to enter a new agreement, conduct which is consistent with the plain language in the lease and the legal definition of an option to renew.

Accordingly, the court concludes AFC and Jordan did not intend the word "renew" to be synonymous with "extend" in the 2001 lease. Rather, the option to renew, by its terms, expired on July 31, 2005. AFC then became a hold-over tenant under KY. REV. STAT. ANN. § 383.160(1). This statute applies and permits the landlord to treat the tenant as holding over for another term of one year unless the parties were actually engaged in negotiations as to a renewal of the lease when the previous term ended or unless the landlord consented to a shorter time period. *Masterson v. DeHart Paint & Varnish Co.*, 843 S.W.2d 332 (Ky. 1992). Neither circumstance was present, here, and the hold-over statute governed AFC's tenancy.

The court will enter partial summary judgment in favor of Jordan on this issue.

## IV.

AFC further argues it is entitled to summary judgment that the greenhouses at Upton Station are trade fixtures. AFC relies on *Batson v. Clark*, 830 S.W.2d 566 (Ky. App. 1998), in which the court held that a storage building, constructed of ten poles set in concrete, was a trade fixture. AFC contends that, likewise, the greenhouses are easily movable structures and consist of curved hollow bows, placed and bolted into metal sleeves that have been driven 18 inches in

to the ground. Seventy-five percent of the sleeves are secured in concrete, which could be removed by a shovel. The bolts and screws could be removed by a wrench and screwdriver. Because the greenhouses are, therefore, easily removable, AFC argues, they are the tenant's personal property and should be declared trade fixtures. The court respectfully disagrees.

"A permanent fixture is properly fixed to the realty so that it becomes a part or parcel of the realty, giving the owner of the realty the same rights to it as the soil itself." *Tarter v. Turpin*, 291 S.W.2d 547 (Ky. App. 1956). "A trade fixture is property which a tenant has placed on rented real estate to advance the business and which may be removed at the end of the tenant's term." *Bank of Shelbyville v. Hartford*, 104 S.W.2d 217, 218 (1937). The key factor is the intention of the parties. *Batson*, 980 S.W.2d at 574.

In *Batson*, the court concluded the storage barn was not only easily removable but that, more important, the landlord and tenant has expressly agreed that the tenant would be required to remove the storage barn at the end of the lease. The lease between AFC and Jordan is silent on this issue.

AFC argues that, notwithstanding, the parties clearly intended that AFC owned the greenhouses. AFC relies on deposition testimony, in which Jordan states that at the time he signed the 2001 lease agreements, "the greenhouses would have belonged [to AFC] up to the point they didn't renew their lease and never did renew their lease, and the greenhouses run with the land. Every improvement on it go with the land."[11] The court does not agree that this testimony supports AFC's contention. Rather, Jordan's answer is consistent with the fact that 2001 lease contained a purchase option, a irrevocable offer to sell during the term of the option.

---

[11]AFC's reply memorandum at 13 (dkt 60).

Jordan, or AFC for that matter, did not anticipate that AFC would fail to exercise the purchase option.

AFC further contends that several other factors indicate that the parties intended the greenhouses to be trade fixtures: AFC paid for the construction costs; the lease states the 2001 value of the property is $40,000 rather than $200,000; Jordan demanded that AFC pay, and AFC did pay, the property taxes which included a tax on the greenhouses as permanent fixtures; and that AFC insured the greenhouses. The court remains unpersuaded.

Unless the parties have an express agreement as in the case of *Batson*, to characterize greenhouses as trade fixtures seems completely out of accord with what the parties must have intended when they made the contract. They are full-sized structures, some of which have concrete walkways. They are not so easily removable as AFC suggests. Jordan estimates they consist of over fifty thousand bolts, nuts and screws, and would require damage to the real estate, even if it is shovel by shovel, to remove the metal sleeves from the concrete pilings.

The court concludes the parties intended the greenhouses to be permanent improvements to the real estate. The court cannot remedy, in law or equity, such monetary loss when a party fails to exercise an option to purchase. *See e.g., Woodrum v. Pulliam*, 453 S.W.2d 263 (Ky. 1970) (stating landlord lawfully terminated lease after tenant simply forgot to exercise his purchase option and lost significant value in improvements to the land). The court will, therefore, enter partial summary judgment in favor of Jordan on this issue.

**V.**

Finally, AFC seeks summary judgment against Jordan on his counterclaim for additional compensation. Jordan has failed to meet his burden under Rule 56 and has failed to oppose or to respond affirmatively to argument that the counterclaim lacks merit. Accordingly, the court will enter summary judgment in favor of AFC on this issue and dismiss the counterclaim.

The court will enter a separate order consistent with this memorandum opinion.

DATE: March 31, 2010

**James D. Moyer**
**United States Magistrate Judge**

Copies to Counsel of Record